UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | 2:08-cr-00348-PMP-RJJ |
| vs. | ) | REPORT & RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| | ) | (Defendant's Motion to Suppress #34) |
| JEFFREY THOMAS COMSTOCK, | ) | |
| Defendant. | ) | |

This matter came before the court for a hearing on Defendant Jeffrey Comstock's Motion to Suppress (#34). The Court has considered the Defendant's Motion to Suppress (#13), the Government's Response (#15), as well as the testimony and evidence presented at the evidentiary hearing. The Court also considered Defendant's supplemental evidence. *See* Order (#65).

**BACKGROUND**

On December 8, 2008, the United States filed a criminal Complaint against Defendants Jeffrey Comstock and Tanya Keenan for (1) conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846 and (2) unlawful possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(b)(1) and (b)(1)(A). On December 17, 2008, a federal grand jury indicted Defendants charging each with (1) conspiracy to distribute methylenedioxymethamphetamine (Ecstasy) in violation of 21 U.S.C. § 846 and (2) unlawful possession with intent to distribute in violation of 21 U.S.C. § 841(b)(1) and (b)(1)(A).

On December 6, 2008, Nevada Highway Patrol Trooper Matt Moonin, a member of the Southern Nevada Highway Interdiction Task Force, was positioned south of Las Vegas on Interstate

1   15 waiting to conduct a traffic stop on a suspect vehicle. Prior to establishing his position along
2   Interstate 15, Sergeant Ken Roll contacted Moonin. Roll explained that the Drug Enforcement
3   Agency (DEA) had identified a vehicle of interest traveling northbound on Interstate 15. Upon
4   receiving this information, Moonin positioned himself along Interstate 15 at approximately mile
5   marker 27 (near the St. Rose Parkway Exit).

6   Moonin was at this location for approximately thirty minutes to an hour prior to initiating a
7   traffic stop on the suspect vehicle. During that time period, Moonin contacted Sergeant Roll to
8   advise that he was in the area. Moonin was also contacted by DEA Special Agent Cindy Prochnow.
9   Prochnow gave Moonin a vehicle description, a partial license plate, and disclosed that it was
10  suspected the vehicle carried a large quantity of Ecstasy. Moonin was also told that there was a male
11  and female in the vehicle. Moonin did not know the identity of either individual prior to initiating
12  the traffic stop.

13  At approximately 1:36 a.m., a northbound vehicle passed Moonin. Moonin was running a
14  stationary radar out of the rear of his vehicle. Moonin clocked the vehicle at 73 miles per hour.
15  Moonin proceeded to merge onto the interstate but did not immediately activate his overhead lights.
16  Within moments of entering the interstate, and before activating his vehicle's overhead lights or
17  siren, Moonin witnessed the suspect vehicle make a lane change without using a turning signal.
18  Subsequently, Moonin activated his overhead lights and siren and initiated a traffic stop.

19  The suspect vehicle pulled over to the right paved shoulder. It was a gold Nissan matching
20  the description previously given to Moonin. After positioning his marked vehicle, Moonin exited
21  his vehicle and walked to the passenger side of the suspect vehicle. Upon reaching the passenger
22  window, Moonin made contact with the occupants of the vehicle. Moonin requested that the driver
23  produce his license and the vehicle's registration. The driver produced a Utah driver's license
24  identifying him as Defendant Jeffrey Comstock. The passenger opened the vehicle's glove
25  compartment and produced registration documents. Without provocation, the passenger also
26  produced an identification card identifying her as Co-Defendant Tanya Keenan. During this period,
27  Moonin made several observations. Keenan's hands were shaking excessively. Moonin testified
28  that the excessive shaking was uncommon for a passenger in a vehicle pulled over for a traffic

1  infraction. Moonin also noted that there were several food wrappers strewn throughout the vehicle
2  and a black suitcase on the rear seat. Additionally, while Keenan was retrieving the requested
3  paperwork, Comstock leaned toward the passenger window and acknowledged that he was probably
4  speeding.[1]

5  After making these general observations, Moonin requested that Comstock exit the vehicle
6  and walk back to the patrol car. Comstock complied. Moonin testified that it was cold outside.
7  Comstock was wearing a t-shirt, jeans and black knit cap. Moonin noticed Comstock put his hands
8  to his face and rub the sides of his head as he exited the vehicle. When Comstock wiped his hands
9  on his pants, Moonin testified that his hands were glistening with sweat. He testified that based on
10 his experience and training the excessive sweating, when viewed in conjunction with the weather
11 conditions and Comstock's attire, was consistent with an individual that was overly nervous and
12 showing outward signs of stress.

13 When Comstock reached the patrol vehicle, Moonin explained that he had been stopped for
14 speeding and for making a lane change without a signal. Comstock acknowledged that he
15 understood the violations. Thereafter, Moonin returned to the patrol vehicle, requested a thorough
16 records check, and transmitted the information on both Comstock and Keenan to Nevada Highway
17 Patrol dispatch. The records request was made at approximately 1:41 a.m. Moonin did not make
18 separate requests for a records check on Defendants – there was one transmission on the two
19 subjects.

20 After transmitting the information to dispatch, Moonin returned to Comstock and engaged
21 him in general conversation about why he was in Nevada.[2] Comstock was not given the *Miranda*
22 warnings prior to this conversation. Comstock stated that he was returning from a visit to a friend
23 in Newport Beach, CA. He could only identify his friend by the nickname "Sleeper." After

---

[1] There is discussion in the record regarding a potential masking odor coming from the vehicle. In certain reporting documents, maintained by the DEA, there was an indication that Moonin smelled the odor of an air freshener coming from the vehicle. On direct examination, Moonin testified that he did not smell such an odor. It is the court's understanding that a supplemental report was produced clarifying that error in the initial report.

[2] The vehicle had a Utah license plate.

1  unsuccessfully attempting to change the topic, Moonin asked Comstock questions regarding the
2  identity of the passenger.  Comstock identified her as his long-time girlfriend but did not know her
3  name.  Eventually, Comstock revealed that he had met her through another of his female friends.
4  Comstock also stated that he and Keenan had stayed for three days at the New York New York Hotel
5  and Casino and seen several shows.  According to Moonin, Comstock continued to sweat and his
6  legs continued to shake in a nervous manner throughout the conversation.

7  At some point during Moonin's conversation with Comstock, a second officer, Detective
8  Jaeger from the Las Vegas Metropolitan Police Department, arrived on the scene.  Although the
9  exact moment of Jaeger's arrival is unclear from the record, the testimony establishes that he arrived
10 at some point near the end of Moonin's conversation with Comstock.   Moonin did not request
11 Jaeger's presence.  After speaking with Comstock, Moonin returned to the suspect vehicle, confirmed
12 the VIN number matched the registration, and engaged Keenan in conversation.  Moonin testified
13 that there were several inconsistencies between Keenan and Comstock's stories.  Moonin testified
14 that, based on his experience and training, the discrepancies were consistent with rehearsed or
15 fabricated stories often used to disguise the act of smuggling narcotics.

16 After speaking with both Keenan and Comstock, Moonin returned to his patrol vehicle.  At
17 approximately 1:45 a.m., nine (9) minutes after the stop was initiated, the records check returned
18 with information on both subjects.  At that point, Moonin gave Comstock back his documents.
19 Moonin also walked up to the suspect vehicle and returned Keenan's documents.  Moonin gave
20 Comstock a verbal warning and told him he was free to leave.

21 Moments after Comstock turned and started to walk away, Moonin inquired as to whether
22 he could ask him a few more questions.  Comstock nodded his head and said yes.  Moonin asked
23 whether there was anything illegal in the vehicle.  Comstock said no.  Moonin then asked whether
24 there were any illegal drugs in the vehicle such as marijuana, methamphetamines, cocaine, heroine,
25 or ecstasy.  Moonin testified that when Comstock was asked about ecstasy he briefly turned his head
26 and looked toward the trunk of the vehicle.  Moonin testified further that, based on his experience
27 and training, most smugglers, when asked about the substance they are carrying, will look at the
28 vehicle or give other external indicators which would lead to the belief that the substance is in the

1  vehicle. Moonin also testified that when questioned about the illegal drugs, Comstock's legs began
2  to shake.
3        After this exchange, Moonin asked Comstock for consent to search the vehicle. Comstock
4  agreed.[3] Moonin proceeded to fill out a consent to search form. After filling out the consent to
5  search form, Moonin presented the form to Comstock. Moonin asked Comstock to read the form
6  and sign it if he agreed. Moonin explained that Comstock did not have to sign the form. Moonin
7  further explained that it was not a warning or a ticket but a consent to search form. After Moonin
8  explained the form, Comstock took the form and read it. After reading the form, Comstock nodded,
9  said "yes", and, at approximately 1:50 a.m., signed the consent to search form. After obtaining
10 Comstock's signature on the consent to search form, Moonin approached Keenan. Moonin asked
11 Keenan the same questions he asked Comstock. At approximately 1:54 a.m., Keenan gave written
12 and verbal consent to search her vehicle.
13       After obtaining written consent from both Comstock and Keenan, Moonin requested that they
14 stand next to the vehicle while the officers conducted the search. Comstock and Keenan walked to
15 a position just to the right front of the suspect vehicle. Thereafter, Moonin retrieved his narcotics
16 detector dog "Teko" from his patrol vehicle. Teko walked around the exterior of the vehicle in a
17 counterclockwise direction. When she came to the right rear trunk, her head snapped to the left
18 indicating that she had caught the odor of an illegal drug. Teko worked the scent to its source at the
19 rear of the trunk lid. Teko then scratched the trunk lid indicating that she had identified the source
20 of the odor. When Teko scratched the trunk, Moonin testified that he noticed Comstock turn around
21 and put his hands behind his back. Moonin returned Teko to the patrol vehicle.
22       After returning Teko to the patrol vehicle, Moonin and Detective Jaeger completed a hand
23 search of the suspect vehicle. The officers found several items inside the trunk, including a large bag
24 containing a smaller bag. Moonin opened the bag and saw several clear plastic packages containing
25 a large amount of blue tablets. Some of the tablets had the Batman insignia, while others had the

---

[3] During his testimony on this subject, Moonin testified that Comstock was asked whether he read and understood English rather than Spanish, as initially stated in the incident report. The court understands a supplemental report has been produced clarifying the error.

- 5 -

1  Internet Explorer insignia on them. Based on Moonin's experience and training, the insignia were
2  consistent with those typically found on Ecstasy pills. The tablets weighed approximately 7.3
3  pounds. Moonin conducted a preliminary field test confirming the tablets were Ecstasy. Comstock
4  and Keenan were placed under arrest at approximately 2:03 a.m.

5  After arrest, Comstock and Keenan were transported to the DEA Las Vegas District Office.
6  At approximately 4:33 a.m., DEA Special Agent Kevin Gillespie and Agent Prochnow interviewed
7  Comstock. Prior to beginning the interview, Trooper Moonin informed Prochnow that Comstock
8  was exhibiting indications of possible drug use. Prochnow was also aware that one of the bags
9  containing Ecstasy tablets was opened. No field sobriety test was administered prior to placing
10 Comstock in the interview room.

11  Once in the interview room, Agent Gillespie read Comstock the *Miranda* warnings. After
12 confirming he understood his rights, Comstock was presented with a waiver form. Comstock agreed
13 to speak with the agents and signed the written waiver. Prochnow testified that Comstock appeared
14 capable of answering questions and did not appear to be disoriented or cognitively impaired.
15 Comstock then gave a lengthy, detailed, and specific confession. His confession included details
16 surrounding his trip, specific conversations with Keenan, specific instructions given to Keenan,
17 specific amounts of money, names of individuals, identities of customers, details surrounding how
18 the Ecstasy would be delivered and distributed, details of prior involvement in drug trafficking, and
19 the approximate number of Ecstasy tablets purchased.

20  Comstock asserts that (1) the initial stop was improper, (2) the detention was unreasonably
21 prolonged, (3) the consent to search was involuntary, and (4) his confession was taken in violation
22 of his *Miranda* rights. Comstock also alleges that the statements made during his detention at the
23 scene of the traffic stop were taken in violation of his *Miranda* rights. Accordingly, Comstock
24 requests that this court suppress all the physical evidence obtained and statements made at the scene
25 of the traffic stop and in the subsequent custodial interview. The Government argues (1) that the
26 initial stop was supported by probable cause, (2) the detention complied with Fourth Amendment
27 requirements, (3) the consent to search was voluntarily given, and (4) that Comstock knowingly,
28 intelligently, and voluntarily waived his *Miranda* rights.


## DISCUSSION

**1. The Fourth Amendment**

    **A. The Initial Stop**

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated." U.S. CONST. AMEND. IV. It is well settled that a vehicle stop by the police is a seizure within the meaning of the Fourth Amendment, *United States v. Garcia*, 205 F.3d 1182, 1186 (9th Cir. 2000) (*citing Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), and is subject to the constitutional requirement that it be reasonable. *Prouse*, 440 U.S. at 653-54. The decision to stop a vehicle is reasonable when there is probable cause to believe a traffic violation occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996).

Initially, Comstock argues that law enforcement's failure to include any indication that this may have been a pretextual stop ought to be considered by this court in its anlaysis. The constitutionality of a traffic stop does not depend on the subjective motivation or intent of the officer. *Whren*, 517 U.S. at 806. That a traffic violation may serve as a pretext for a stop is irrelevant so long as there are objective circumstances to justify the stop. *United States v. Willis*, 431 F.3d 709, 714 (9th Cir. 2005). Here, Trooper Moonin testified that the vehicle was pulled over for two separate traffic violations – speeding in violation of Nevada Revised Statutes (NRS) 484.361 and changing lanes without using the appropriate turn signal in violation of NRS 484.305.

An unusually large portion of the evidentiary hearing revolved around whether Comstock was actually speeding. It is undisputed that the vehicle Comstock was driving was clocked at 73 miles per hour. According to Trooper Moonin's testimony, the portion of the interstate where the vehicle was clocked had a speed limit of 65 miles per hour. Comstock retained a private investigator who testified that the portion of the interstate where Comstock was clocked actually had a speed limit of 70 miles per hour. Both the Government and Comstock introduced pictures which allegedly support their individual version of the posted speed limit. Unfortunately, the

pictorial evidence suffers from temporal defects. The pictures submitted by the Government were taken approximately six (6) months after the stop. The pictures submitted by Comstock were taken approximately four (4) months after the stop. Comstock's private investigator testified on cross-examination that the area of the interstate where Comstock was pulled over had been through significant construction for at least the past couple of years. He testified further that, in his experience, speed limits fluctuate based upon construction and that he would have no way of knowing what the speed limit at the specific location would have been on the date of the traffic stop. The only evidence in the record to support what the speed limit may have been at the time is Trooper Moonin's testimony.

Subsequent to the evidentiary hearing, Comstock submitted a Motion for Leave to Supplement Evidence (#48) with an attached email from a Nevada Department of Transportation employee stating that the speed limit between the California/Nevada border and Las Vegas was increased from 55 miles per hour to 70 miles per hour in 1996. The Government filed its Response (#51) opposing the request on the grounds that (1) it is irrelevant given the clocked speed of 73 miles per hour, (2) the email has no authenticating information, and (3) the information in the email is vague. Among other things, the Government noted that the email implies that the speed limit is reduced when the interstate enters Las Vegas, but does not indicate at what point that occurs. The Government also points out that the email addresses only the general speed limit and does not account for potential fluctuations due to construction projects which may have affected the area in question.

Ultimately, the court granted Comstock's request to supplement. *See* Order (#65). That the request was granted certainly doesn't elevate the effect of the evidence on the factual or legal determinations of the court. Indeed, after review, the court agrees with the Government. There is nothing in the supplemental email that has the tendency to establish anything other than the general speed limit. It is entirely plausible that the speed limit on the date of the traffic stop was 65 miles per hour due to construction. There is nothing in the email which would persuade the court to factually conclude that the speed limit on the date in question was 70 miles per hour.

1   Even assuming a speed limit of 70 miles per hour, Comstock cannot demonstrate how
2   that would eliminate probable cause for a speeding violation. It is undisputed that the vehicle
3   was clocked at 73 miles per hour. Nevada Revised Statute 484.361(1)(c) provides that "[i]t is
4   unlawful for any person to drive or operate a vehicle of any kind or character at ... [a] rate of
5   speed greater than that posted by a public authority for the particular portion of highway being
6   traversed." Based on the record here, there was probable cause to believe Comstock was
7   speeding.
8   Further, NRS 484.305(1)(b) provides that "[i]f a highway has two or more clearly marked
9   lanes for traffic traveling in one direction, vehicles must: (a) [b]e driven as nearly as practicable
10  within a single lane; and (b) [n]ot be moved from that lane until the driver has given the
11  appropriate turn signal and ascertained that such movement can be made with safety." Moonin
12  testified that after obtaining the radar readout he merged onto the interstate. He did not activate
13  his overhead lights or siren. As he merged, he witnessed Comstock make a lane change without
14  using his turn signal. This is not disputed and provides a second, independent basis for the traffic
15  stop. Accordingly, the court finds that Moonin had probable cause to believe a traffic violation
16  had occurred and the initial stop was justified.

17  **B.  Prolonged Detention**

18  The gravamen of the Fourth Amendment dispute concerns the circumstances occurring
19  after initiation of the traffic stop. Comstock contends that there was no basis for Moonin to ask
20  Comstock to exit the vehicle. He contends that running his criminal records check unnecessarily
21  prolonged the detention. He also contends that running a criminal records check on the
22  passenger unnecessarily delayed the detention. The Government argues that the length and scope
23  of the initial investigation was appropriately tailored to the investigation of the traffic infraction.
24  A traffic stop is an investigative detention and, therefore, a seizure within the meaning of
25  the Fourth Amendment. *United States v. Sharpe*, 470 U.S. 675, 682 (1985). There is no
26  definitive rule on the time limit for a lawful investigative detention. *United States v. Torres-*
27  *Sanchez*, 83 F.3d 1123, 1128 (9th Cir. 1996) (citation omitted). Rather, courts undertake a fact-
28  specific inquiry, based on the totality of the circumstances, to determine whether the detention is

reasonable. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Law enforcement officers are not required to move at top speed when executing a traffic stop. *United States v. Turvin*, 517 F.3d 1097, 1102 (9th Cir. 2008). "The critical inquiry is whether the officers 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Sharpe*, 470 U.S. at 686.

Here, Moonin lawfully pulled over a vehicle that was speeding and made an illegal lane change. He approached the vehicle and, through the passenger side window, requested that the driver produce his driver's license and registration. The driver produced his license which identified him as Defendant Comstock. The passenger opened the glove compartment and produced the vehicle registration. Additionally, without a request, she provided Moonin with an identification card identifying her as Defendant Keenan. Thereafter, Moonin requested that Comstock exit the vehicle and accompany him back to his patrol car. Comstock complied. In *Pennsylvania v. Mimms*, 434 U.S. 106, n. 6 (1977) (per curiam) the Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment." Law enforcement's legitimate and weighty interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver that is already lawfully stopped to exit the vehicle. *Mimms*, 434 U.S. at 110-111. Moonin did not violate the Fourth Amendment by requesting that Comstock exit the vehicle.

Upon exiting the vehicle, Comstock accompanied Moonin back to the patrol vehicle. Once there, Moonin contacted the Nevada Highway Patrol Dispatch and requested a thorough records check on Comstock and Keenan. "A motorist's expectations, when he sees a policeman's lights flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration" *See Berkemer v. McCarty*, 468 U.S. 420, 437 (1984); *see also United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) cert. Denied, 550 U.S. 946 (2007) (finding that a traffic stop was not unnecessarily prolonged when the officer ran a records check on the driver); *United States v. McCrae*, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996) ("[Records] checks are run largely to protect

the officer. Considering the tragedy of the many officers who are shot during routine traffic stops ..., the almost simultaneous computer check of a person's criminal record ... is reasonable and hardly intrusive."); *United States v. Purcell*, 236 F.3d 1274, 1278 (11th Cir. 2001) ("The request for criminal histories as part of a routine computer check is justified for officer safety."); *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996) ("The results of a criminal history check could indicate whether further back-up or other safety precautions were necessary."). Accordingly, the court finds that the stop was not unnecessarily prolonged due to Moonin's request that dispatch run a criminal records check on Comstock.[4]

Comstock's argument that the criminal records check on passenger Keenan unlawfully prolonged the stop also fails. Comstock relies on *United States v. Henderson*, 463 F.3d 27 (1st Cir. 2006) to support the proposition that an officer cannot unreasonably prolong the detention of a driver to launch an investigation of the passenger. Although the Court agrees with the general proposition, the record does not support the conclusion that running a criminal records check on the passenger in this instance expanded the scope of the detention, changed the target of the detention, or unreasonably prolonged the detention. *See cf.*, *Purcell*, 236 F.3d at 1278 (11th Cir. 2001) (holding that a request for criminal histories of the driver and passenger at the outset of a traffic stop and before the officer issued a warning or citation was both reasonable and minimally intrusive). Additionally, the Court will not adopt the bright line rule advocated by Comstock. The Supreme Court has long held that "reasonableness" is the touchstone of Fourth Amendment analysis. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Reasonableness is measured by examining the totality of the circumstances. *Id*. Rigid time limitations and bright-line rules are generally inappropriate. *Sharpe*, 470 U.S. at 685.

Here, Keenan produced her identification card without a request and produced the registration that listed her as the owner of the vehicle. Upon return to his vehicle, Moonin requested a criminal records check on Keenan in conjunction with a check on Comstock. It was

---

[4] Comstock also argued that once he acknowledged the alleged violations, Moonin should have issued a warning or written a ticket but not continued with a background check. There is no authority for this position and it is rejected.

- 11 -

1  a singular request on two subjects. Moonin did not make the request separate from his request on
2  Comstock. Moonin testified that the request was made as part of his routine computer check.
3  The request was made before Moonin had issued a warning, citation, or otherwise informed
4  Comstock and Keenan that they were free to leave. A review of the dispatch records indicates
5  that it took just over a minute to conduct the records check on Keenan. Moonin had the results of
6  both records checks within approximately four minutes from the initial request. Thus, the Court
7  finds that requesting a criminal records check on Keenan did not unreasonably prolong the
8  detention.

### C. Comstock's Statements To Moonin During the Traffic Stop

Comstock argues that the statements he made to Moonin during the course of the traffic stop should be suppressed because the conversation unlawfully prolonged the traffic stop. In its opinion in *United States v. Chavez-Valenzuela*, 268 F.3d 719 (9th Cir. 2001), the Ninth Circuit held that, during a traffic stop, a police officer may only "ask questions that are reasonably related in scope to the justification for his initiation of contact" and may expand the scope of the questioning beyond the initial purpose only if he "articulate[s] suspicious factors that are particularized and objective. *Chavez-Valenzuela*, 268 F.3d at 724; *see also United States v. Murillo*, 255 F.3d 1169, 1174. Subsequently, the Ninth Circuit recognized that the underlying assumption of *Chavez-Valenzuela* that "*any* questioning unrelated to the purpose of the stop, regardless of its effect on the duration of the stop, need[s] to be supported by reasonable suspicion" is no longer good law, inasmuch as it has been overruled by *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (holding that no reasonable suspicion is required to justify questioning that does not prolong the stop). *Turvin*, 517 F.3d at 1100; *see also United States v. Mendez*, 476 F.3d 1077, 1079-80 (9th Cir. 2007).

In *United States v. Mendez*, 476 F.3d 1077 (9th Cir. 2007), the suspect was stopped because his car did not have a license plate or temporary registration tag. While one officer conducted a records check, a second officer waited at the curb with the suspect and asked him several questions unrelated to his license plate or vehicle registration. Once the officer completed the records check, he started back toward the suspect to inform him that his temporary

- 12 -

1  registration plate had expired; en route, he overheard the suspect telling the other officer that he
2  was "trying to get away from the gang life" and that he had spent time in an Illinois prison. As
3  he approached the suspect, he asked the suspect why he had been imprisoned to which the
4  suspect replied that he had been convicted of a weapons violation. The officer then asked
5  whether he had any weapons in the car, and the suspect admitted having a firearm in the driver's
6  door handle. The suspect was arrested. A subsequent vehicle search revealed a loaded, small
7  caliber, semi-automatic pistol. 476 F.3d at 1078-1079. Mendez moved to suppress the handgun,
8  arguing that the officers lacked reasonable suspicion to interrogate him about matters beyond the
9  purpose of the stop. The trial court denied the motion. On appeal, the Ninth Circuit also rejected
10 the argument, relying on the Supreme Court's decision in *Muehler*, which held that "mere police
11 questioning does not constitute a seizure" and thus no reasonable suspicion is required to justify
12 questioning that does not prolong an initially lawful stop. *Mendez*, 476 F.3d. at 1080, *quoting*
13 *Muehler* 544 U.S. at 101.

14       Here, Moonin asked Comstock several questions while waiting for dispatch to conduct a
15 records search. Moonin asked why Comstock was in Nevada, where he was coming from, why
16 he was there, who the passenger was, and made other general inquiries into the purpose of
17 Comstock's trip. After speaking with Comstock, Moonin moved to the front of the suspect
18 vehicle and verified the VIN number. Moonin also spoke with the passenger whose responses
19 were inconsistent with Comstock's responses. This all occurred in an approximately four (4)
20 minute span between Moonin's request for the records check and the time dispatch relayed the
21 results of that request. There is nothing in the record to suggest any of this questioning
22 prolonged the initial stop. It all occurred during the lawful initial stop and was permissible.

23       Comstock also argues that the statements should be suppressed because they were given
24 without the *Miranda* warnings. The obligation to administer *Miranda* warnings attaches once a
25 person is subject to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 465 (1966).
26 Custody turns on whether there is a formal arrest or restraint on freedom of movement of the
27 degree associated with a formal arrest. *United States v. Rodriguez-Preciado*, 399 F.3d 1118,
28 1127 (9th Cir. 2005) (*citing United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002)). A person

1  detained for a traffic stop is not in custody for purposes of *Miranda*. *See United States v. Butler*,
2  249 F.3d 1094, 1098 (9th Cir 2001) ("The case books are full of scenarios in which a person is
3  detained by law enforcement officers, is not free to go, but is not 'in custody' for *Miranda*
4  purposes. A traffic stop is not custody."). Because a traffic stop is not custody, Moonin was not
5  obligated to administer the *Miranda* warnings before speaking with Comstock.

**D. Consent To Search**

7  At approximately 1:45 a.m., within approximately four (4) minutes of his request for a
8  criminal records check and approximately nine (9) minutes after the initial stop, Nevada
9  Highway Patrol Dispatch relayed the results of its records check to Moonin. Upon receipt,
10 Moonin returned Comstock's and Keenan's documents. Moonin then informed Comstock that
11 he was free to leave. Within moments, Moonin asked Comstock whether he could ask him a few
12 more questions. Comstock agreed. During the course of this questioning, Moonin asked
13 Comstock whether he would consent to a search of the vehicle. Moonin proceeded to fill out a
14 consent to search form. After filling out the consent to search form, Moonin presented the form
15 to Comstock. Moonin asked Comstock to read the form and sign it if he agreed. Moonin
16 explained that Comstock did not have to sign the form. Moonin further explained that it was not
17 a warning or a ticket but a consent to search form. After Moonin explained the form, Comstock
18 took the form and appeared to read it. Next, Comstock nodded, said "yes", and, at approximately
19 1:50 a.m., signed the consent to search form. After obtaining Comstock's signature on the
20 consent to search form, Moonin approached Keenan. Moonin asked Keenan the same questions
21 he asked Comstock. At approximately 1:54 a.m., Keenan gave written and verbal consent to
22 search her vehicle. Moonin employed a narcotics dog, Teko, on the exterior of the vehicle. Teko
23 indicated there may be narcotics in the trunk of the vehicle. After a search of the interior,
24 Moonin opened the trunk and discovered a large amount of Ecstasy. Comstock and Keenan were
25 placed under arrest.

26 Comstock argues that his consent was not voluntary because he was not free to leave
27 and because he was allegedly impaired by the use of Ecstasy at the time the consent was given. The
28 government must demonstrate that consent to a warrantless search is voluntary. *United States v.*

*Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990). The court looks at the totality of the circumstances in determining whether consent is voluntary. *Ohio v. Robinette*, 519 U.S. 33 (1996). In evaluating whether consent to a search is voluntary, the Court must consider: (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the individual was told he had the right not to consent; and (5) whether the individual was told that a search warrant could be obtained. *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir.2000). None of these factors is dispositive. *United States v. Castillo*, 566 F.2d 1071, 1082 (9th Cir. 1988).

Contrary to Comstock's assertion, the record shows there were only two officers on the scene when consent was requested. Comstock was not in custody and had been advised that he was free to leave. Neither officer had his gun drawn and, based on the record, it does not appear that Detective Jaeger played any role in the stop at all. Comstock was presented with a consent to search form, read it, and Moonin testified that Comstock signed it.[5] The form clearly provides the parameters of any search and expressly sets forth that Comstock had the right to refuse to consent. It also provides that no threats, promises, force, or coercion was used in obtaining the consent. The records indicates that the exchange occurred in a non-confrontational, conversational tone. Based on the totality of the circumstances, the Court concludes that the consent in this case was voluntary.

Comstock's claim that his consent was not voluntary because he was allegedly under the influence of Ecstasy is also unavailing. After Comstock was arrested and transported the DEA office and before he was interviewed, Moonin contacted Agent Prochnow. Moonin advised her that Comstock was exhibiting external signs, including bloodshot eyes and profuse sweating, consistent with an individual who may be under the influence of narcotics. Moonin further testified that, at the scene, Comstock did not appear disoriented and Moonin did not believe Comstock was under the influence. Generally, being under the influence of alcohol or drugs does not render consent involuntary. *See United States v. George*, 987 F.2d 1428, 1430-31 (9th

---

[5] During the evidentiary hearing, the Court ordered the original be produced to Comstock for inspection because it was difficult to see the signatures on the photocopied form.

1  Cir. 1993). There is nothing in the record to support the conclusion that Comstock's will was
2  overborne or his capacity for self-determination critically impaired to such a degree as to render
3  his consent involuntary. Comstock read the consent to search form, stated that he understood it,
4  and signed it. The consent was valid.

5  **2. Confession Made By Comstock At The DEA Office**

6  After his arrest, Comstock was transported to the DEA Las Vegas office for questioning.
7  He was placed in an interview room. At approximately 4:33 a.m., DEA Special Agent Kevin
8  Gillespie and Agent Prochnow interviewed Comstock. Prior to beginning the interview,
9  Prochnow was aware that Comstock was exhibiting indications of possible drug use. She was
10  also aware that one of the bags containing Ecstasy tablets was opened. Once in the interview
11  room, Agent Gillespie read Comstock the *Miranda* warnings. Comstock confirmed that he
12  understood his rights and was presented with a waiver. He signed the waiver and agreed to speak
13  with the agents. Prochnow testified that Comstock appeared capable of answering questions and
14  did not appear to be disoriented or cognitively impaired. Comstock then gave a lengthy, detailed,
15  and specific confession.

16  Comstock challenges the alleged waiver on the ground that he was visibly intoxicated and
17  thus unable to knowingly, intelligently, and voluntarily waive his rights. Inculpatory statements
18  are voluntary when they are the product of a rational intellect and a free will. *See Beaty v.*
19  *Schriro*, 509 F.3d 994, 999 (9th Cir. 2007) (*citing United States v. Leon Guerrero*, 847 F.2d
20  1363, 1365 (9th Cir. 1988)). The test is whether, considering the totality of the circumstances,
21  the government obtained the statement by phsyical or psychological coercion or by improper
22  inducement so that the suspect's will was overborne. *Id*. The record is absolutely devoid of any
23  evidence indicating that Comstock's statements were obtained through physical or psychological
24  coercion or by improper inducement. Comstock had not been subjected to repeated or prolonged
25  questioning. There is no evidence of physical punishment or deprivation. Comstock is an adult
26  and there is no evidence that he lacks education or has low intelligence. Thus, the critical inquiry
27  is whether Comstock's capacity for self-determination was critically impaired to such a degree as
28  to render his waiver involuntary. It was not. Comstock's confession was detailed and specific.

It included details surrounding his trip, specific conversations with Keenan, specific instructions given to Keenan, specific amounts of money, names of individuals, identities of customers, details surrounding how the Ecstasy would be delivered and distributed, details of prior involvement in drug trafficking, and the approximate number of Ecstasy tablets purchased. Although Comstock may have been showing external signs of intoxication, it is clear that he was lucid and fully aware.  The waiver is valid.[6]

## RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that Defendant's Motion to Suppress (#34) be **DENIED**.

## NOTICE

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court on or before February 4, 2010.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this   21st   day of January, 2010.

_____
ROBERT J. JOHNSTON
United States Magistrate Judge

---

[6] That the Government may have referenced Comstock's potential intoxication at the bail hearing is not dispositive of Comstock's cognitive capacity at the time the waiver was signed and the inculpatory statements were made.